United States District Court
Southern District of Texas
**ENTERED**
November 08, 2024
Nathan Ochsner, Clerk

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| TYLER PEEL, *et al.*, | § | |
| *Plaintiffs*, | § | |
| | § | |
| v. | § | Case No. 4:23-CV-02417 |
| | § | |
| CPAPERLESS, LLC d/b/a | § | |
| SAFESEND, *et al.*, | § | |
| *Defendants*. | § | |

## JUDGE PALERMO'S REPORT AND RECOMMENDATION

This is a civil action alleging violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO").[1] Plaintiff Tyler Peel, in his individual capacity and in a derivative action on behalf of Acct1st Technology Group, LLC ("Acct1st") (collectively "Plaintiffs"), alleges that Defendants[2] defrauded them over many years in a scheme to siphon away business and steal intellectual property. Second Am. Compl., ECF No. 48. Pending before the Court is Defendants' motion to dismiss Plaintiffs' RICO claim. ECF No. 55. The primary question presented is whether Plaintiffs' allegations are adequate to state a civil RICO claim. If not, the Court must

---

[1] The district judge to whom this case is assigned referred the case to this Court pursuant to 28 U.S.C. § 636(b)(1)(B). Order, ECF No. 45.

[2] The named defendants consist of the remaining members of Acct1st—Jeromy Gensch, Andrew Hatfield, Tess DeGraffenreid—as well as Beach Family Limited Partnership ("Beach FLP"), Linda Beach as executrix and personal representative of the Estate of James Beach ("Estate"), and cPaperless, LLC d/b/a SafeSend ("cPaperless") (collectively "Defendants"). ECF No. 48 ¶¶ 7-11. The final member of Acct1st, James Beach, passed away on April 12, 2022. *Id.* ¶ 10-11.

then determine whether to retain jurisdiction over Plaintiffs' state law claims,[3] or whether Plaintiffs should be allowed a chance to replead diversity jurisdiction. After thoroughly considering Plaintiffs' second amended complaint, the briefing,[4] and the applicable law, the Court recommends that Plaintiffs' RICO claim be dismissed for failure to state a claim. Because Plaintiffs have no more federal claims after multiple attempts at repleading their RICO claim, the Court recommends the second amended complaint be dismissed without prejudice for lack of subject matter jurisdiction.

## I.    FACTUAL AND PROCEDURAL BACKGROUND.

### A.    Events Surrounding the Formation of Acct1st and cPaperless.

Peel is a software developer and a founding member of Acct1st, a web-based accounting technology firm. ECF No. 48 ¶¶ 1, 32. Peel alleges that he has autism spectrum disorder ("ASD"). *Id.* ¶¶ 14-20. Gensch was allegedly aware of this and knew that Peel could "be easily influenced and kept in the dark." *Id.* ¶ 21. Gensch and Peel's working relationship began around 2001 and developed into a friendship over the years. *Id.* ¶¶ 2, 21, 56. Peel also worked with Hatfield, DeGraffenreid, and

---

[3] Plaintiffs additionally assert claims for fraud, tortious interference, unjust enrichment, violation of state trade secret and theft statutes, and breach of fiduciary duty. ECF No. 48 ¶¶ 127-97. While Peel is a citizen of Washington, Acct1st and cPaperless are LLCs, and all other individual parties are citizens of Texas and Kansas. *Id.* ¶¶ 5-11. The only sources of jurisdiction identified are federal question for the RICO claims and supplemental jurisdiction for the state-law claims. *Id.* ¶ 12 (citing 28 U.S.C. §§ 1331, 1367).

[4] Defendants filed a separate memorandum in support of their motion. ECF No. 56. Plaintiffs then filed a response to the motion, ECF No. 57, and Defendants filed a reply, ECF No. 60.

Beach around this time when Gensch created VentureSoft, Inc., and various other startups before forming Acct1st. *Id.* ¶¶ 22-30.[5] In 2004, Gensch and Beach formed SchoolDocs, LLC, to sell document management software in the higher education market, with Peel writing the software suite and providing tech support. *Id.* ¶ 31.[6]

In 2005, Peel, Gensch, Hatfield, DeGraffenreid, and Beach formed Acct1st to market and sell accounting software. *Id.* ¶ 32. Peel designed most of the software for Acct1st and served as upper-tier technical support. *Id.* Plaintiffs identify several key pieces of software that formed Acct1st's software package, such as "Tic, Tie & Calculate," "CPA SafeMail," and "CPA SafeSign." *Id.* ¶¶ 50, 52. Peel allegedly did not create those products—instead, Plaintiffs contend that Defendants "blatantly copied the Acct1st software"[7] and outsourced development of those products to India. *Id.* ¶ 50. Beach registered the trademark for Tic, Tie & Calculate in 2007. *Id.* ¶ 45. The patent filings for the software reference Acct1st and include screenshots

---

[5] Plaintiffs identify several other entities that Peel, Gensch, Hatfield, and DeGraffenreid allegedly formed around this time: Net Impact Software, Inc.; Context Software, Inc.; and InventureSoft, LLC. ECF No. 48 ¶¶ 24-30. Peel allegedly had some ownership interest in each of these entities, although what percentage was not clear, as Peel was not a capital investor. *Id.* ¶¶ 40-41. However, in 2013 Peel signed an operating agreement with VentureSoft to sort out the ownership details for these entities. *Id.* ¶ 38. Most of those entities have since been shut down. *See id.* ¶¶ 43, 78-79. Peel does not assert any claims based on the 2013 agreement, nor does he allege that Defendants engaged in any fraud pertaining to the opening, closing, and restructuring of those other entities.

[6] Plaintiffs appear to imply that SchoolDocs remains in business. ECF No. 48 ¶ 79. *But see* ECF No. 36-1 at 223 (certificate of termination of SchoolDocs dated January 31, 2023). Peel does not assert any derivative claims on behalf of SchoolDocs or allege any wrongdoing pertaining to it.

[7] Plaintiffs previously alleged that Defendants reverse-engineered those products by hiring foreign software engineers. *See* First Am. Compl., ECF No. 16 ¶¶ 33, 40, 72.

taken from Acct1st website. *Id.* ¶¶ 46-47. At least as of 2008, Acct1st provided licenses to its customers for Tic, Tie & Calculate, among other software products. *Id.* ¶ 33. Peel allegedly believed that Acct1st owned those products based on statements contained in service agreements and other documents. *Id.* Yet Acct1st was also apparently "owned by VentureSoft," and all revenue collected by Acct1st and SchoolDocs was passed through to VentureSoft. *Id.* ¶¶ 40, 43 n.7.

Acct1st filed for Chapter 11 bankruptcy in early 2009. *Id.* ¶ 53. Around that time, Gensch informed Peel by telephone that "nothing would change" regarding Acct1st's clients, sales, or ownership, and that Acct1st's total debt was $70,000. *Id.* ¶ 54. In the bankruptcy filings, however, Hatfield represented "that Acct1st 'does not own the product' that it markets and sells." *Id.* ¶ 64. Peel allegedly did not receive any bankruptcy documents until September of 2021. *Id.* ¶¶ 60, 65. Despite the bankruptcy proceedings, Peel continued to receive compensation from Acct1st, with his largest paychecks arriving after 2013. *Id.* ¶ 59. Based on assurances from Gensch and Beach that the bankruptcy was proceeding smoothly, Peel never felt the need to review any of the bankruptcy documents. *Id.* ¶¶ 60-65.

Meanwhile, Hatfield, Beach, Gensch, and DeGraffenreid created cPaperless allegedly without Peel's knowledge sometime around 2008.[8] *Id.* ¶ 71. cPaperless

---

[8] Plaintiffs do not specifically allege when cPaperless was formed, despite the Court ordering Plaintiffs to amend their complaint to include "[a] clear timeline of all relevant facts," including those "contained in public records subject to judicial notice." Order, ECF No. 44 at 13; *cf.* ECF

began offering "Tic, Tie & Calculate" on its public website as early as November of 2008, alongside other products allegedly "owned" by Acct1st. *Id.* ¶¶ 52, 105 n.25. Beach officially transferred the trademark for Tic, Tie & Calculate to cPaperless in 2013. *Id.* ¶ 48. cPaperless later renamed "CPA SafeMail" to "SafeSend Exchange," and "CPA Safe Sign" became "SignatureFlow." *Id.* ¶ 79. Eventually, cPaperless would become a significant player in the accounting technology industry. *Id.* At some unknown point between 2008 and 2013, Plaintiffs allege that Defendants began stealing Acct1st's software and revenue. *Id.* ¶¶ 49-52, 79, 96(a), 111, 117.

### B. Alleged RICO Predicate Acts.

In addition to the 2009 telephone conversation about Acct1st's bankruptcy, *id.* ¶ 97(a), Plaintiffs describe several events and communications between 2013 and 2021 that allegedly furthered Defendants' scheme of keeping Peel in the dark about cPaperless while siphoning assets from Acct1st.

On January 26, 2013, Peel and Gensch executed an operating agreement for VentureSoft clarifying the ownership interests in SchoolDocs and Acct1st. *Id.* ¶ 38. The agreement stated that Peel owned 56% of the outstanding membership interests in VentureSoft, which in turn owned Acct1st and SchoolDocs. *Id.* ¶ 43. Peel also vaguely describes online communications with Gensch, Hatfield, and DeGraffenreid

---

No. 25-8 (certificate of formation for cPaperless dated Oct. 22, 2008). Nonetheless, Plaintiffs concede that cPaperless was in existence and operating a public website by at least November of 2008. ECF No. 48 ¶ 105 n.25.

in 2013 regarding his ownership percentages. *Id.* ¶¶ 36, 42, 97.[9] However, when Gensch finally produced Acct1st's tax and bankruptcy documents in September of 2021, Peel's total ownership was listed as slightly over 14%. *Id.* ¶¶ 39, 40 n.5.

On October 13, 2014, Gensch informed Peel by instant message that a buyer was potentially interested in purchasing Acct1st. *Id.* ¶ 70. Gensch stated that Acct1st was a "reputable name" and "good product," and that the potential buyer had been "shopping Acct1st over the past year or so." *Id.* Acct1st was never sold. *See id.* ¶ 79.

In the summer of 2015, Peel and the other members of Acct1st met for a company retreat in Washington. *Id.* ¶ 77. Hatfield and others allegedly mentioned they needed Acct1st's source code to be held in escrow as a contractual contingency. *Id.*[10] On August 5, 2015, Gensch sent a follow-up email asking for Peel "to provide a copy of the SchoolDocs source code" to be held in escrow as a contingency pursuant to an existing contract with Virginia College. *Id.* ¶ 97(e). Peel provided the source code as requested. *Id.* Indeed, this was a common practice as a contingency against contract default, and Peel had provided the source code in response to similar requests from Gensch on four other occasions. *Id.* ¶ 51 & n.12.

---

[9] Plaintiffs further allege that in January of 2013, DeGraffenreid informed Peel via instant message that, based on his ownership percentage, Peel's "salary would increase to 'somewhere around $150K+.'" ECF No. 48 ¶ 97(c). Indeed, Plaintiffs allege that Peel's salary exceeded that estimate in 2013, 2014, 2015, and 2017. *Id.* ¶ 59.

[10] Plaintiffs did not originally allege that Defendants stole Acct1st's source code at the 2015 company retreat—rather, this was described as "a desperate attempt to prove that they own the Acct1st source code." ECF No. 16 ¶ 38.

On January 31, 2017, Gensch emailed VentureSoft's 2016 tax return to Peel, Hatfield, and DeGraffenreid, stating that "2016 was rough." *Id.* ¶ 97(f). Plaintiffs allege that this tax return was a counterfeit because it was different from the one Gensch provided Peel in 2021. *Id.* Plaintiffs vaguely allege that some of the amounts were different; however, the only specific difference Plaintiffs identify is the name of the tax preparer. *Id.* Peel and the other members of Acct1st also exchanged emails relating to the Acct1st website in March of 2017, where Gensch stated his belief "that the website needed to remain intact 'as it always has,'" while noting "that the website had never changed since inception." *Id.* ¶ 76.

Plaintiffs further allege several conversations in 2018, 2019, and 2020 where the other members of Acct1st painted a rosy outlook of the business. *Id.* ¶ 97(g). Plaintiffs primarily complain that the other Acct1st members never disclosed their involvement with cPaperless in those conversations. *Id.*

Sometime in 2021, Gensch shut down VentureSoft. *Id.* ¶ 78 n.18. On July 13, 2021, Peel attempted to contact Beach about "concerns related to the business." *Id.* ¶ 49 n.8. Gensch and Beach eventually sent Peel ownership, tax, and bankruptcy documents for Acct1st in September of 2021, which is what allegedly tipped Peel off about the existence of cPaperless. *Id.* ¶¶ 40 n.5, 63-65. Beach passed away on April 12, 2022. *Id.* ¶ 11. The Acct1st website shut down on March 5, 2023, before the company was formally dissolved on June 12, 2023. *Id.* ¶ 79.

### C.    Procedural Background.

Peel, in his individual capacity and on behalf of Acct1st, filed suit on June 30, 2023, more than ten years after the formation of cPaperless and the apparent theft of Acct1st's software. Compl., ECF No. 1. Plaintiffs asserted federal claims under RICO, as well as state law claims for fraud, theft of trade secrets, and other various causes of action under Texas statutes. *Id.* Plaintiffs amended with minor adjustments, ECF No. 16, and Defendants moved to dismiss, ECF No. 24, arguing that Plaintiffs' claims are time-barred and fail to satisfy the prerequisites for a RICO claim, among other arguments. Defendants also filed a motion for sanctions. ECF No. 26. Plaintiffs sought leave to amend again, attaching a proposed second amended complaint with more minor adjustments. ECF Nos. 30, 30-1.

The Court granted the motion for leave to amend and mooted the remaining motions. Order, ECF No. 44. But because Plaintiffs' proposed amendments failed to cure many of the flaws pointed out in Defendants' motions, the Court gave Plaintiffs specific instructions regarding what to include in a new complaint. *Id.* at 13-15. Plaintiffs filed a second amended complaint mostly in compliance with the Court's instructions. ECF No. 48.[11] Nonetheless, the Court noted that several deficiencies

---

[11] Plaintiffs assert a civil claim for violation of RICO against all Defendants. ECF No. 48 ¶¶ 90-126. Plaintiffs then assert claims for fraudulent misrepresentation, fraudulent nondisclosure, and negligent misrepresentation against Beach, Beach FLP, Gensch, Hatfield, and DeGraffenreid. *Id.* ¶¶ 127-53. Plaintiffs additionally assert claims—some of which only on behalf of Acct1st—for tortious interference with contracts and prospective business relationships, violations of the Texas

remained and entered a briefing schedule for a renewed motion to dismiss limited to Plaintiffs' RICO claim and subject matter jurisdiction. Order, ECF No. 54. The Court specifically directed the parties to RICO's "pattern of racketeering activity" and "continuity" requirements. *Id.* at 1-2 & n.2 (citing *D&T Partners, L.L.C. v. Baymark Partners Mgmt., L.L.C.*, 98 F.4th 198, 207 (5th Cir. 2024)). The Court also advised the parties that no further leave to amend would be granted. *Id.* at 2.

## II.     THE STANDARD FOR MOTIONS TO DISMISS.

A court may dismiss a complaint for a "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). To survive a Rule 12(b)(6) motion to dismiss, a complaint "does not need detailed factual allegations," but must provide the plaintiff's grounds for entitlement to relief—including factual allegations that when assumed to be true "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). That is, a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). A claim has facial plausibility "when the plaintiff pleads factual content

---

Uniform Trade Secrets Act and Texas Theft Liability Act, civil conspiracy, and unjust enrichment against all Defendants. *Id.* ¶¶ 154-85. Acct1st also now asserts derivative claims for breach of formal fiduciary duty against the former members of Acct1st. *Id.* ¶¶ 186-92. In his individual capacity, Peel now asserts a claim for breach of informal fiduciary duty against Gensch. *Id.* ¶¶ 193-97. Plaintiffs further contend that those claims are inherently undiscoverable and thus not barred by limitations due to Gensch and Beach's fraudulent concealment. *Id.* ¶¶ 3, 55, 97, 128, 144.

that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. at 678 (citing *Twombly*, 550 U.S. at 556). Although this plausibility standard "is not akin to a 'probability requirement,'" it does require more than simply a "sheer possibility" that a defendant has acted unlawfully. *Id*. Thus, a pleading need not contain detailed factual allegations, but it must set forth more than "labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555 (citation omitted).

The court must accept well-pleaded facts as true, but legal conclusions are not entitled to the same assumption of truth. *Iqbal*, 556 U.S. at 678-79 (citation omitted). The court should not "strain to find inferences favorable to the plaintiffs." *Stringer v. Town of Jonesboro*, 986 F.3d 502, 512 (5th Cir. 2021) (quotation omitted). A court may consider the contents of the pleadings, including attachments thereto, as well as documents attached to the motion, if they are referenced in the plaintiff's complaint and are central to the claims. *See Sparks v. Tex. Dep't of Transp.*, 144 F. Supp. 3d 902, 903 (S.D. Tex. 2015). "[I]t is clearly proper in deciding a 12(b)(6) motion to take judicial notice of matters of public record." *Hamilton v. Promise Healthcare*, No. 23-30190, 2023 WL 6635076, at *3 (5th Cir. Oct. 12, 2023) (quotation omitted). The court should not evaluate the merits of the allegations but must satisfy itself only that the plaintiff has adequately pleaded a legally cognizable claim. *Bright v. City of Killeen*, 532 F. Supp. 3d 389, 396 (W.D. Tex. 2021) (citing *United States ex rel.*

*Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 376 (5th Cir. 2004)).

When alleging fraud or mistake, Federal Rule of Civil Procedure 9(b) requires that a party "state with particularity the circumstances constituting fraud or mistake." Rule 9(b)'s particularity requirement has long played a screening function, standing as a "gatekeeper to discovery, a tool to weed out meritless fraud claims sooner than later." *Ramirez v. Allstate Vehicle & Prop. Ins. Co.*, 490 F. Supp. 3d 1092, 1116 (S.D. Tex. 2020) (quoting *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 185 (5th Cir. 2009)). At the very least, "Rule 9(b) requires the who, what, when, where, and how of the alleged fraud to be laid out." *Kreway v. Countrywide Bank, FSB*, 647 Fed. App'x 437 (5th Cir. 2016) (cleaned up). Plaintiffs therefore "must specify the statements contended to be fraudulent . . . and explain why the statements were fraudulent." *Elson v. Black*, 56 F.4th 1002, 1009 (5th Cir. 2023) (quotation omitted). Courts are required to "apply Rule 9(b) to fraud complaints with 'bite' and 'without apology.'" *Grubbs*, 565 F.3d at 185 (quotation omitted).

## III.   DEFENDANTS' MOTION TO DISMISS SHOULD BE GRANTED.

Defendants ask the Court to dismiss Plaintiffs' RICO claim, after which the Court would lack subject matter jurisdiction over any remaining state law claims. Defendants argue that Plaintiffs fail to adequately plead any RICO predicate acts or the requisite pattern of racketeering activity. Plaintiffs oppose dismissal of the RICO claim but fail to directly respond to many of Defendants' arguments. Plaintiffs

otherwise agree that without their RICO claim the Court lacks jurisdiction over the remaining claims. Although Defendants would prefer to allow Plaintiffs a chance to replead diversity jurisdiction and keep this litigation in federal court, Plaintiffs are less enthusiastic about that prospect. The Court addresses each of these issues below.

### A.     Plaintiffs Fail to State a Viable RICO Claim.

#### 1.     *RICO Prohibits a Pattern of Racketeering Activity.*

"Congress enacted RICO in order to prohibit conduct involving a pattern of racketeering activity." *Alvarez v. Rosas*, No. H-18-4646, 2020 WL 2061491, at *4 (S.D. Tex. April 29, 2020) (citing *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 453 (2006); *Word of Faith World Outreach Ctr. Church, Inc. v. Sawyer*, 90 F.3d 118, 122 (5th Cir. 1996)). "One of RICO's enforcement mechanisms is a private right of action, available to '[a]ny person injured in his business or property by reason of a violation' of the RICO's substantive restrictions." *Id*. (quoting *Anza*, 547 U.S. at 453 (quoting 18 U.S.C. § 1964(c))). However, due to the availability of treble damages under RICO, courts "must be wary of transforming business-contract or fraud disputes into federal RICO claims." *Arruda v. Curves Int'l, Inc.*, 861 Fed. App'x 831, 836 (5th Cir. 2021). "Breach of contract is not fraud, and a series of broken promises therefore is not a pattern of fraud." *Id.* (quoting *Perlman v. Zell*, 185 F.3d 850, 853 (7th Cir. 1999)).

To state a civil RICO claim under 18 U.S.C. § 1962, a plaintiff must allege

three common elements: "(1) a person who engages in (2) a pattern of racketeering activity, (3) connected to the acquisition, establishment, conduct, or control of an enterprise." *N. Cypress Med. Ctr. Operating Co., Ltd. v. Cigna Healthcare*, 781 F.3d 182, 201 (5th Cir. 2015) (quotation omitted).[12] An act of "racketeering activity," commonly referred to as a "predicate act," is defined to include certain criminal acts, including mail and wire fraud. *See* 18 U.S.C. § 1961(1) (defining "racketeering activity"); *Waste Mgmt. of La., L.L.C. v. River Birch, Inc.*, 920 F.3d 958, 964 (5th Cir. 2019) (referring to racketeering activity as a "predicate act").

To rise to the level of "racketeering activity" there must be two or more predicate acts that are: (1) related; and (2) amount to or pose a threat of continued criminal activity. *Alvarez*, 2020 WL 2061491, at *4 (quoting *Abraham v. Singh*, 480 F.3d 351, 355 (5th Cir. 2007)). The "continuity" element is needed to "prevent RICO from becoming a surrogate for garden-variety fraud actions properly brought under state law." *Malvino v. Delluniversita*, 840 F.3d 223, 231 (5th Cir. 2016) (quotation omitted). "'Continuity' is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 241 (1989) (citing *Barticheck v. Fid. Union Bank/First Nat'l State*, 832 F.2d 36, 39

---

[12] Plaintiffs assert claims under each subsection of § 1962. ECF No. 48 ¶¶ 90-126. Regardless of the precise subsection allegedly violated, "a pattern of racketeering activity" is a necessary element for any RICO claim. *N. Cypress*, 781 F.3d at 201.

(3d Cir. 1987)). Closed-ended continuity "requires predicate acts that extend over a "substantial period of time," meaning more than a single year. *Malvino*, 840 F.3d at 232 (quoting *H.J. Inc.*, 492 U.S. at 242). Where the defendant has "terminated any allegedly fraudulent scheme" before suit is filed, open-ended continuity is generally unavailable. *Id.* at 233 (quoting *Craig Outdoor Advert., Inc. v. Viacom Outdoor, Inc.*, 528 F.3d 1001, 1028 (8th Cir. 2008)). This continuity inquiry is simplified "in cases where alleged RICO predicate acts are part and parcel of a single, otherwise lawful transaction, for in such cases, a 'pattern of racketeering activity' has not been shown." *Abraham*, 480 F.3d at 355 (cleaned up).

### 2. *Plaintiffs Fail to Adequately Allege Any RICO Predicate Acts.*

When the Court granted Plaintiffs leave to amend, the Court ordered Plaintiffs to specifically "[i]dentify each alleged act of racketeering activity," including which "statute or law that is alleged to have been violated, and the facts surrounding each violation." Order, ECF No. 44 at 14. Plaintiffs complied by identifying three statutes that Defendants allegedly violated—18 U.S.C. §§ 1343 (wire fraud), 1832 (theft of trade secrets), 1952 (interstate travel in aid of racketeering)[13]—and seven specific fraudulent acts that allegedly violated those statutes. ECF No. 48 ¶¶ 96-97. In their motion to dismiss, Defendants argue that Plaintiffs have failed to sufficiently plead racketeering activity because the second amended complaint does not identify two

---

[13] Each of these are listed in the RICO definition of "racketeering activity." 18 U.S.C. § 1961(1).

or more predicate acts with particularity under Rule 9(b). ECF No. 56 at 12-13. Defendants proceed to analyze each alleged predicate act, noting several deficiencies for each, including how the alleged representations were fraudulent. *Id.* at 14-24. In response, however, Plaintiffs cursorily address only four of these alleged predicate acts. ECF No. 57 at 12. Further, as Defendants point out in reply, Plaintiffs do not dispute the applicability of Rule 9(b) to the alleged predicate acts. ECF No. 60 at 2.

Failure to respond to an argument constitutes waiver of that issue. Courts have routinely held that "if a plaintiff fails to respond to an argument raised in a motion to dismiss, it is deemed to be abandoned." *Heritagemark, LLC v. Unum Life Ins. Co. of Am.*, No. 4:22-CV-04513, 2024 WL 1078301, at *10 (S.D. Tex. Feb. 8, 2024), *adopted*, 2024 WL 1443179 (S.D. Tex. Mar. 31, 2024) (quotation omitted); *accord Black v. N. Panola Sch. Dist.*, 461 F.3d 584, 588 n.1 (5th Cir. 2006). In this instance, Plaintiffs do not dispute Defendants' arguments that the Rule 9(b) applies to the predicate acts alleged here.[14] Plaintiffs also never dispute Defendants' arguments as

---

[14] The Court agrees that any predicate acts of wire or mail fraud are governed by Rule 9(b) pleading standards. *See* Order, ECF No. 44 at 8, 14; *Arruda*, 861 Fed. App'x at 834; *Bustos v. Invierte En Tex., LLC*, No. 4:22-CV-02690, 2023 WL 5487672, at *4 (S.D. Tex. Aug. 9, 2023), *adopted*, 2023 WL 5489048 (S.D. Tex. Aug. 24, 2023). Defendants have not, however, identified any cases applying Rule 9(b) to theft of trade secrets under 18 U.S.C. § 1832. *See* ECF No. 56 at 12-13. Nonetheless, as alleged, Plaintiffs' theory of theft is that Defendants "stole, appropriated, took, carried away, *by fraud* certain intellectual property, trade secrets, and confidential information owned by Acct1st." ECF No. 48 ¶ 96(a) (emphasis added). Because Plaintiffs explicitly allege theft "by fraud," *id.*, and because they do not dispute the applicability of Rule 9(b) under such circumstances, *see* ECF No. 57 at 11-14, the Court agrees that Plaintiffs must plead any predicate act under § 1832 with particularity, *see* Fed. R. Civ. P. 9(b) (requiring particularity when "alleging fraud" in pleadings). In contrast, § 1952 is not a fraud statute and thus not subject to Rule 9(b).

to several allegedly fraudulent acts. *See* ECF No. 57 at 12. Plaintiffs have therefore abandoned all other potential predicate acts by failure to brief them in the response.[15] Accordingly, the Court need only consider the following four alleged predicate acts: (1) the alleged theft of Acct1st's source code in the summer of 2015; (2) Gensch's email requesting the source code on August 5, 2015; (3) instant messages with Gensch and Hatfield on January 26, 2013; and (4) Gensch's communications on October 13, 2014. ECF No. 57 at 12; ECF No. 48 ¶ 77-78, 97(b), (d)-(e).

---

[15] The abandoned predicate acts consist of: (1) Gensch's telephone conversation with Peel about Acct1st's bankruptcy in March of 2009; (2) DeGraffenreid's instant message regarding Acct1st ownership shares in January of 2013; (3) Gensch's email about VentureSoft's 2016 tax return on January 31, 2017; and (4) conversations on July 27, 2018, and July 31, 2020, where Gensch failed to disclose the existence of cPaperless. ECF No. 48 ¶ 97(a), (c), (f)-(g). Even if Plaintiffs had not abandoned these predicate acts, the Court agrees with Defendants' arguments, *see* ECF No. 56 at 14-22, that Plaintiffs fail to allege what representations each Defendant made and explain how they were "fraudulent when made," *Bustos*, 2023 WL 5487672, at *4. Indeed, there is no apparent connection between those four predicate acts and the alleged "scheme to defraud Peel and Acct1st of its technology." ECF No. 48 ¶ 106. As for the final catchall predicate act, Plaintiffs only identify two conversations with the requisite specificity: instant messages with Gensch on July 27, 2018, and an email from Gensch on July 31, 2020. *Id.* ¶ 97(g). For predicate acts of wire or mail fraud, nondisclosure may be "proof of a scheme to defraud only where the defendant is under a duty to disclose." *Arruda*, 861 Fed. App'x at 834 (quoting *United States v. Harris*, 821 F.3d 589, 600 (5th Cir. 2016)). Even assuming Gensch and the other members of Acct1st owed Peel fiduciary duties as alleged, *see* ECF No. 48 ¶¶ 142-43, Plaintiffs never describe the circumstances surrounding the alleged nondisclosures with particularity, *see id.* ¶ 97(g). Nor does Plaintiffs' response brief address wire fraud by nondisclosure. *See* ECF No. 57. The Court is unaware of any authority that would transform every innocuous conversation into mail or wire fraud absent some type of transaction. *See, e.g.*, 37 C.J.S. *Fraud* § 33 (2024) (noting that "partner and copartner" relationship will "impose a duty to reveal all facts material to the transaction involved"); RESTATEMENT (SECOND) OF TORTS § 551 (AM. LAW INST. 1977) (identifying scenarios where liability may arise from nondisclosure in "business transaction"). *But cf. Bradford v. Vento*, 48 S.W.3d 749, 756 (Tex. 2001) (noting Texas has not adopted Restatement § 551). Regardless, Plaintiffs' failure to brief these predicate acts constitutes abandonment. *See Heritagemark*, 2024 WL 1078301, at *10.

### a.    Plaintiffs' fact allegations are insufficient to support any predicate acts of interstate travel or theft of trade secrets.

Plaintiffs appear to allege that several Defendants committed one or more predicate acts under RICO when they attended a company retreat in 2015. *See* ECF No. 48 ¶¶ 96(a), 129(f). The fact allegations for that company retreat are as follows:

> In furtherance of their fraud, Hatfield, DeGraffenreid, and Gensch crossed state lines from Texas in the summer of 2015 to visit Peel and his wife in Washington under the pretext of a "company retreat." During this in-person meeting with Peel, Hatfield, DeGraffenreid, and Gensch lied to Peel by claiming that they needed the source code for Acct1st's proprietary technology to be held in escrow as a contractual contingency to their biggest customer if Acct1st was forced to shut down.

*Id.* ¶ 77. At some point thereafter, "Defendants added [popular Acct1st] products to their SafeSend.com website and removed them from the Acct1st.com website." *Id.* ¶ 78. Plaintiffs do not specifically identify this conduct as a predicate act in their second amended complaint. *See id.* ¶¶ 96-97. However, in response to Defendants' motion to dismiss, Plaintiffs point to these fact allegations to contend that "Hatfield, DeGraffenreid, and Gensch traveled from Texas to Washington in the summer of 2015 . . . to fraudulently acquire the source code for Acct1st's proprietary technology." ECF No. 57 at 12. Plaintiffs argue Defendants have therefore violated § 1952 (interstate travel) and § 1832 (theft of trade secrets). *Id.* at 11-12.

To the extent Plaintiffs argue that this conduct constitutes interstate travel in aid of racketeering under 18 U.S.C. § 1952, the Court has already noted that "merely

crossing state lines is not a predicate act." Order, ECF No. 44 at 9 n.8. Indeed, that statute only criminalizes interstate travel to promote "unlawful activity." 18 U.S.C. § 1952(a). That term is narrowly defined as meaning: (1) gambling, liquor, drugs, or prostitution enterprises; (2) extortion, bribery, or arson; or (3) money laundering. *Id.* § 1952(b); *accord Armendariz v. Chowaiki*, No. EP-14-CV-451-KC, 2016 WL 8856919, at *16 (W.D. Tex. Mar. 31, 2016), *aff'd*, 683 Fed. App'x 338 (5th Cir. 2017). Defendants operate a competing accounting software firm. ECF No. 48 ¶¶ 71-79. Plaintiffs do not allege any acts of extortion, bribery, money laundering, or any other kinds of "unlawful activity" as it is narrowly defined under § 1952(b).

Nor do Plaintiffs explain how any of Defendants' alleged interstate travel is a predicate act. Plaintiffs cursorily assert that "[e]ach time Defendants traveled across state lines—physically or through communications—to carry on their fraud against Peel constitutes a separate predicate act." ECF No. 57 at 12. The only authority cited for this proposition is *Hanover American Insurance Co. v. Gibbs*, No. CIV.A. 15-559, 2015 WL 5971139, at *5 (E.D. La. Oct. 14, 2015). But *Hanover* is inapposite, as that case only involved predicate acts of mail and wire fraud. *Id.* (citing 18 U.S.C. §§ 1341, 1343). The *Hanover* court never addressed interstate travel. Plaintiffs fail to allege any predicate acts involving interstate travel in aid of racketeering activity under § 1952, even considering conduct beyond the 2015 company retreat.

Furthermore, to the extent Plaintiffs contend that the alleged conduct qualifies

as theft of trade secrets, Plaintiffs fail to plead fraud with particularity. *See* FED. R. CIV. P. 9(b). Section 1832 punishes anyone who "steals, or without authorization appropriates, takes, carries away, or conceals, or by fraud, artifice, or deception obtains" any trade secret information. 18 U.S.C. § 1832(a)(1). Plaintiffs specifically allege that Defendants "stole . . . *by fraud* certain . . . trade secrets . . . owned by Acct1st." ECF No. 48 ¶ 96(a) (emphasis added). While offering few specifics on the alleged theft, Plaintiffs imply that Defendants "fraudulently acquire[d] the source code for Acct1st's proprietary technology" at the 2015 company retreat. ECF No. 57 at 12. But after multiple opportunities to amend, Plaintiffs still have not put forth a coherent narrative of theft "by fraud" as alleged. Even assuming the who (Gensch and Beach), when (summer of 2015), and where (somewhere in Washington) of the fraud are met, Plaintiffs identify no fraudulent representations with particularity, *i.e.*, the what or how of the alleged fraud. *See Kreway*, 647 Fed. App'x at 437-38. These allegations thus fail to satisfy the particularity requirements of Rule 9(b).

Even viewed under the more lenient Rule 8(a) pleading standards, Plaintiffs' other fact allegations directly contradict the theory that Defendants stole Acct1st's source code at the 2015 company retreat. First, cPaperless was formed in late 2008 and began advertising Acct1st software for sale on its website around the same time. ECF No. 48 ¶ 105 n.25. Gensch asked for the Acct1st source code on four other occasions, including in 2010, and Peel apparently complied at that time. *Id.* ¶ 51.

Plaintiffs do not allege that those requests were illegitimate or fraudulent. Beach then assigned the trademark for Tic, Tie & Calculate to cPaperless in 2013. *Id.* ¶ 48. Thus, if cPaperless already had Acct1st's software in 2013, why would Defendants need to steal the source code *again* in 2015? Second, although Plaintiffs portray the 2015 company retreat as a scheme to steal Acct1st's source code, Plaintiffs supply an excerpt from a follow-up email after the company retreat (which is alleged as a separate predicate act) where Gensch asked Peel to provide "the SchoolDocs source code on disk" for a contract with "Virginia College." *Id.* ¶ 97(e). Plaintiffs do not allege that the source codes for SchoolDocs and Acct1st are identical. *Cf. id.* ¶ 40 (noting Acct1st and SchoolDocs "operate in disparate markets"). Plaintiffs also do not allege that no contract existed between SchoolDocs and Virginia College. There is no explanation for this apparent confusion.[16] Thus, even if the Court viewed the alleged theft of trade secrets as a non-fraud-based predicate act, Plaintiffs have not plausibly alleged a violation of § 1832 as required to establish a RICO predicate act.

---

[16] The Court surmises that this factual gap is the result of attempting to plead around obvious bars to Plaintiffs' claim of theft. Plaintiffs originally alleged that Defendants copied Acct1st's products through reverse engineering. *See* ECF No. 16 ¶¶ 33, 40, 72. Defendants moved to dismiss in part on the basis that "reverse engineering is specifically exempted from the statutory definition of 'improper means'" for theft of trade secrets. ECF No. 25 at 37; *cf.* 18 U.S.C. § 1839(6)(B) (noting that "improper means" for purposes of § 1832 "does not include reverse engineering"). Plaintiffs then amended to vaguely allege that "Defendants effectively stole the software from Acct1st." ECF No. 48 ¶ 111. The Court need not determine whether judicial estoppel precludes Plaintiffs from adopting this new, inconsistent position. *See Allen v. C & H Distributors, L.L.C.*, 813 F.3d 566, 572 (5th Cir. 2015) (discussing elements and effect of judicial estoppel). Instead, it is sufficient for the Court to conclude that Plaintiffs' attempt to further obfuscate the circumstances of Defendants' alleged theft of Acct1st's software has rendered its claim even more implausible.

### b.    *Plaintiffs do not adequately allege any predicate acts for wire or mail fraud.*

The primary elements of wire fraud under 18 U.S.C. § 1343 are: "(1) a scheme to defraud; (2) the use of, or causing the use of, wire communications in furtherance of the scheme; and (3) a specific intent to defraud." *United States v. Spalding*, 894 F.3d 173, 181 (5th Cir. 2018). The elements of mail fraud under 18 U.S.C. § 1341 are the same but with "use of the mails." *Id.* (quotation omitted). An email, telephone call, or other message may satisfy the "wire communications" element. *See United States v. Hungerford*, No. 21-30359, 2023 WL 8179273, at *4 (5th Cir. Nov. 27, 2023), *cert. denied*, 144 S. Ct. 1128, 218 L. Ed. 2d 358 (2024) (emails); *Energium Health v. Gabali*, No. 3:21-CV-2951-S, 2022 WL 16842660, at *8 (N.D. Tex. Nov. 9, 2022) (phone calls, text messages, and emails). The "scheme to defraud" element requires proof that the defendant "made some kind of a false or fraudulent material misrepresentation." *Spalding*, 894 F.3d at 181. Wire communications "that conceal or delay detection of an ended scheme can be considered essential to the scheme." *Hungerford*, 2023 WL 8179273, at *4 (quotation omitted).

### i.    *Any fraud in the instant messages from January 26, 2013, is not pleaded with particularity.*

Plaintiffs' first alleged predicate act of wire fraud[17] stems from a conversation

---

[17] Although Plaintiffs allege that Defendants violated "both the wire and mail fraud statutes," ECF No. 48 ¶ 96(b), Plaintiffs never cite the statute for mail fraud, 18 U.S.C § 1341. Instead, Plaintiffs allege conduct involving use of email, not actual "use of the mails," *i.e.*, the shipping of physical

via instant message on January 26, 2013, where "Gensch and Hatfield fraudulently

provided Peel with assurances related to his stake in their jointly-owned companies."

ECF No. 57 at 12. Plaintiffs allege that Gensch and Hatfield represented "that Peel

owned at least 56% in Acct1st." ECF No. 48 ¶ 97(b). Plaintiffs allege the purpose of

this representation was "to keep Peel working for Defendants and Acct1st and to

ensure that he would not question the compensation he was receiving." *Id.* Plaintiffs

imply that representation was false because in 2021, "Beach produced a spreadsheet

of the Acct1st ownership history showing Peel as only ever having had 14%." *Id.*

¶ 40 n.5. However, elsewhere in the complaint, Plaintiffs allege that around the same

time in 2013, Gensch, Hatfield, and DeGraffenreid told Peel that he "was a member

owning fifty-six percent (56%) of SchoolDocs," while saying nothing about Acct1st.

*Id.* ¶ 36. Indeed, Plaintiffs clarify that:

> Gensch, Hatfield, DeGraffenreid, and Beach advised Peel that he
> owned fifty-six percent (56%) of SchoolDocs, but Gensch, Hatfield,
> DeGraffenreid, and Beach refused to provide Peel with any
> documentation reflecting his ownership interest. As to Acct1st, Peel
> *reasonably believed* that he also owned 56% of the outstanding
> membership interests in Acct1st.

*Id.* ¶ 95 (emphasis added). Plaintiffs also allege that Peel has documentation showing

56% ownership of the outstanding membership interests in VentureSoft, but he never

received documentation for Acct1st. *Id.* ¶ 43. In other words, Plaintiffs do not allege

---

mail or packages. *See Spalding*, 894 F.3d at 181. Plaintiffs therefore do not allege any predicate
acts of mail fraud, and the Court only considers emails for the purposes of wire fraud.

*with particularity* any false representations regarding Peel's ownership percentage of Acct1st as opposed to the other, jointly owned entities not involved in this case. *See* ECF No. 56 at 17 n.9. Plaintiffs cite no authority permitting an inference of wire fraud from Peel's unilateral assumption regarding his ownership of Acct1st.

Furthermore, as Defendants point out, *see id.* at 17-18, Plaintiffs allege that on January 26, 2013, the same date as the instant messages, "Peel finally signed and notarized an Operating Agreement for VentureSoft that Gensch had prepared," ECF No. 48 ¶ 38. That agreement allegedly confirmed that Peel would own 56% of the shares VentureSoft. *Id.* ¶ 39 n.3. This background context is crucial to Plaintiffs' allegations of fraud because Gensch and Hatfield's statements must be viewed in the context of the alleged contract formation. *See* FED. R. CIV. P. 9(b) (requiring "the circumstances constituting fraud" to be stated with particularity). Plaintiffs do not specify whether the alleged representations occurred before or after Peel signed the operating agreement, or during negotiations. *Cf. United States ex rel. Richardson-Eagle, Inc. v. Marsh & McLennan Cos.*, No. CIV.A. H-05-0411, 2005 WL 3591014, at *7 & n.18 (S.D. Tex. Dec. 30, 2005) (dismissing fraud claim under Rule 9(b) where "no facts alleged as to what was said before, during, or after the contract negotiations"). Plaintiffs do not attach a copy of the agreement, nor do Plaintiffs allege any claims for breach of contract. More importantly, Plaintiffs do not squarely respond to any of Defendants' arguments. *See* ECF No. 57 at 12-14. The Court is

thus unpersuaded that Plaintiffs' inconsistently pleaded allegations of wire fraud pertaining to Peel's ownership percentage of Acct1st satisfy Rule 9(b).

> ii.    *Plaintiffs fail to identify any fraudulent statements in the communications from October 13, 2014.*

Plaintiffs second predicate act of wire fraud stems from another conversation via instant messaging on October 13, 2014. ECF No. 48 ¶ 97(d). In 2014, the other members of Acct1st were looking to sell the company, and according to Plaintiffs:

> on October 13, 2014, via instant messaging, Gensch informed Peel that an individual named Chris Fredrickson was "shopping Acct1st over the past year or so." During this same conversation, Gensch stated that Acct1st is a "reputable name" and a "good product."

*Id.* ¶ 97(d). Plaintiffs question if "Acct1st owned no assets, as was represented in the bankruptcy filings," then "[w]hat would a potential buyer acquire, if not the products owned by Acct1st?" *Id.* But there is no allegation that these statements were false, and as Defendants point out, "corporate goodwill associated with a 'reputable name' and a 'good product' is a commonly-acquired asset in the purchase of a company." ECF No. 56 at 19. In response, Plaintiffs insist in conclusory fashion that:

> Gensch—on behalf of himself, Hatfield, and DeGraffenreid—made fraudulent representations to Peel via interstate communications on October 13, 2014 and on multiple other occasions in order to induce Peel to continue business with Defendants.

ECF No. 57 at 12. Plaintiffs never clarify what about Gensch's statements was false.

*See Elson*, 56 F.4th at 1009. Plaintiffs thus fail to plead wire fraud with particularity.

        *iii.*    *Any fraud in Gensch's email from August 5, 2015, is not pleaded with particularity.*

The third predicate act of wire fraud is an email from Gensch purportedly sent to Peel on August 5, 2015, shortly after the company retreat. ECF No. 48 ¶ 97(e). Plaintiffs include an excerpt of the allegedly fraudulent email:

> Virginia College pointed out today that by contract we were supposed to provide a copy of the SchoolDocs source code on disk to be held by a 3rd party escrow agent. ONLY in the event of defaulting on the contract or going bankrupt would anyone from Virginia College be able to gain access to the source code. . . . I'd like for the files to be zipped and password protected for security reasons. We can provide the password to the escrow agent in a separate mailing, but will soon need you to get the source code to disk and then FedEx accordingly.

*Id.* Plaintiffs allege these statements were false, and that Peel "provided the source code because he believed he was fulfilling Acct1st's contractual obligations." *Id.*

The problem with Plaintiffs' theory, however, is Gensch's email specifically asked for "a copy of the *SchoolDocs* source code," not Acct1st's. *Id.* (emphasis added). Defendants point out this glaring inconsistency. ECF No. 56 at 20. Yet Plaintiffs offer no explanation, other than insisting that this email was intended "to cause Peel to transfer the source code for Acct1st's proprietary technology (i.e., trade secrets) to Gensch." ECF No. 57 at 12. How Gensch's request for the SchoolDocs source code caused Peel to transfer the Acct1st source code is unexplained.[18] The Court fails to comprehend how these allegations support a predicate act of wire

---

[18] Nor is this the only inconsistency in Plaintiffs' theft-by-fraud narrative, as discussed *supra*.

fraud.

Accordingly, despite multiple opportunities to amend and a clear checklist of what must be included to state a RICO claim, Order, ECF No. 44 at 13-14, Plaintiffs still fail to plead a single predicate act with the requisite particularity per Rule 9(b). Because a civil RICO claim requires at least two predicate acts to establish a "pattern of racketeering activity," 18 U.S.C. § 1961(5), Plaintiffs fail to state a RICO claim. The Court may dismiss Plaintiffs' civil RICO claim on this basis alone. However, because the Court specifically requested briefing on RICO's "continuity" element, *see* Order, ECF No. 54 at 1-2, the Court also discusses those arguments below.

### 3.    *Plaintiffs Fail to Allege a Pattern of Racketeering Activity.*

Even assuming Plaintiffs' allegations satisfy Rule 9(b) and establish at least two predicate acts of wire fraud or theft of trade secrets, Defendants further contend that Plaintiffs fail to adequately allege all "elements necessary to establish a pattern of racketeering activity." ECF No. 56 at 24. Rather than a pattern of criminal activity, Plaintiffs' allegations boil down to "a single instance of theft (at a time and place unknown) accompanied by occasional and unrelated messages." *Id.* at 25.[19]

---

[19] Defendants frame this issue as a matter of relatedness. *See* ECF No. 56 at 24-25. In support of their relatedness arguments, Defendants cite *Lockett v. Helfman Motor Sales, Inc.*, No. 4:21-CV-4082, 2022 WL 17730574, at *5 (S.D. Tex. Aug. 31, 2022). But *Lockett* never discussed relatedness—instead, the district court dismissed the RICO claim for failure to allege two or more predicate acts. *Id.* ("One incident cannot constitute a pattern of racketeering activity."). The Court therefore does not reach relatedness and addresses these arguments under the simplified single-transaction framework set forth in *Word of Faith* and *D&T Partners*.

Defendants thus argue that Plaintiffs fail to establish RICO's "continuity" element under any standard. *Id.* at 25-27.[20] Plaintiffs counter that Defendants' conduct satisfies both the closed- and open-ended tests for continuity. ECF No. 57 at 16-24. Plaintiffs then insist, in a footnote, that Fifth Circuit case law unfavorable to their position is "partly in error." *Id.* at 7-8 n.1. The Court is unpersuaded by Plaintiffs' attempts to show continuity.

> ### a.    *Plaintiffs cannot establish continuity where the alleged conduct amounts to a single, lawful transaction.*

The purpose of civil RICO is to punish "long term criminal conduct," and the element of "continuity" or "threat of continuing activity" is necessary to weed out "garden-variety fraud actions" that belong in state courts. *Malvino*, 840 F.3d at 231 (quotations omitted). In the Fifth Circuit, no continuity or pattern can be established where the "alleged RICO predicate acts are part and parcel of a single, otherwise lawful transaction." *Word of Faith*, 90 F.3d at 123 (5th Cir. 1996). Thus, in such RICO cases, it usually "is unnecessary to delve into the arcane concepts of closed-end or open-ended continuity." *Id.* In *Word of Faith*, the lawful transaction was "the

---

[20] Defendants further argue that Plaintiffs have not pleaded with particularity the other elements of a civil RICO claim under specific subsections. ECF No. 56 at 27-29. Because the Court did not request briefing on those issues, the Court declines to consider those arguments at this juncture. Moreover, Defendants cite no authority that those other RICO elements must be pleaded with particularity. *Cf. Abraham*, 480 F.3d at 355-56 (noting RICO continuity prong not subject to "stringent pleading standard"); *Tel-Phonic Servs., Inc. v. TBS Intern., Inc.*, 975 F.2d 1134, 1138 (5th Cir. 1992) (noting Rule 9(b) "applies to the pleading of fraud as a predicate act in a RICO claim" but not other elements); *Montesano v. Seafirst Commercial Corp.*, 818 F.2d 423, 427 (5th Cir. 1987) (applying notice pleading standards to RICO enterprise element).

production of television news reports," which allegedly included false statements about the church. *Id.* Likewise, the Fifth Circuit has found continuity lacking where all alleged predicate acts arose during the defense of a lawsuit, s*ee In re Burzynski*, 989 F.2d 733, 743 (5th Cir. 1993), or during a corporate merger, *see Delta Truck & Tractor, Inc. v. J.I. Case Co.*, 855 F.2d 241, 244 (5th Cir. 1988).

Most recently, the Fifth Circuit has applied this reasoning to the alleged theft of assets and trade secrets from an e-commerce company in *D&T Partners*. In that case, the defendants sought to purchase the plaintiff's online retail operations, but the deal slowly unraveled, resulting in bankruptcy, loan default, and foreclosure. 98 F.4th at 202-03. The plaintiff filed suit in federal court under RICO, but the district court dismissed the 194-page complaint after multiple amendments, finding the plaintiff failed to plead a pattern of racketeering activity. *Id.* at 203. Although the plaintiff alleged "over 100 predicate acts" of mail and wire fraud, money laundering, and other crimes over a period of four years, the Fifth Circuit reasoned that "pleading continuity is not as straightforward." *Id.* at 205-06. Instead, the Fifth Circuit looked to several considerations including the racketeering scheme's duration, the existence of multiple schemes victims, the number of victims, and whether the scheme's "goals were finite." *Id.* at 206-08.[21] While the alleged duration weighed in favor of

---

[21] The *D&T Partners* court considered these factors within the context of closed-ended continuity, *see* 98 F.4th at 205, whereas prior case law appears to frame this question as a preliminary step in the continuity analysis, *see Word of Faith*, 90 F.3d at 123. Either way, the Supreme Court has

continuity, the limited number of victims injured, and the scheme's singular goal weighed against such a finding. *Id.* Moreover, the alleged "criminal undertaking was part and parcel of an otherwise lawful commercial endeavor—that is, a loan default and its resulting foreclosure." *Id.* at 208 (citing *Word of Faith*, 90 F.3d at 123). The Fifth Circuit thus affirmed the district court's dismissal with this parting observation:

> Simply put, what began as an ordinary business transaction ended with stolen assets, a defunct company, and many unhappy creditors. Even if Defendants engaged in fraudulent acts in the interim, the complaint alleges that the acts arose in pursuit of a single end: transferring Global's assets to Windspeed. While the plan ultimately took several years to realize, the number of victims and the nature and objective of the alleged scheme do not support an inference of a closed-ended pattern of racketeering activity.

*Id.* at 208.

In the Court's view, the instant case is indistinguishable from *D&T Partners*. The only victims injured by Defendants' conduct are Peel and Acct1st. ECF No. 48 ¶ 3. Defendants' sole scheme was "to steal Acct1st's most popular technology" and "attract customers to cPaperless." *Id.* ¶ 2. Defendants allegedly accomplished this theft in 2015, or likely much earlier. *See id.* ¶¶ 48, 77, 105 n.25. Although Plaintiffs allege the scheme spanned from 2005 through 2021, *id.* ¶ 99, aside from the alleged theft of trade secrets, Plaintiffs at most identify seven other predicate acts of wire

---

cautioned against applying overly rigid or "inflexible" tests that limit the means of establishing a "pattern of racketeering activity," instead adopting "a commonsense, everyday understanding of RICO's language." *H.J. Inc.*, 492 U.S. at 240-41. The Supreme Court also explicitly approved of the concepts of closed-ended and open-ended continuity. *Id.* at 241. The Court thus approaches each of these inquiries separately.

fraud, most of which were allegedly intended to prevent Peel from discovering the existence of cPaperless, *id.* ¶¶ 3, 97, 144. But actions "to conceal the fraudulent predicates of their criminal undertaking," even if illegal, "do nothing to extend the duration of the underlying scheme." *D&T Partners*, 98 F.4th at 208 (quoting *Jennings v. Auto Meter Prod., Inc.*, 495 F.3d 466, 474 (7th Cir. 2007)). Even if the Court could accept Plaintiffs' vague RICO allegations at face value, seven or eight predicate acts spread across 16 years is sporadic at best. *See H.J. Inc.*, 492 U.S. at 238-39. ("A pattern is not formed by 'sporadic activity.'"). This is a far cry from the more than 100 predicate acts still found insufficient in *D&T Partners*.

Indeed, as the Court previously noted, "Peel complains of little more than commonplace commercial activity. Defendants started a business, which went bankrupt, so Defendants started a new business." Order, ECF No. 44 at 10. While Peel may in retrospect disagree with how Gensch and the others managed Acct1st or its assets, Peel never played a role in management. ECF No. 48 ¶¶ 26, 32. Furthermore, unlike the "several millions of dollars in unpaid debts" alleged in *D&T Partners*, 98 F.4th 198, Peel's alleged injuries are wholly speculative, *see* ECF No. 48 ¶ 97(a) ("Peel would not have continued business with Defendants from 2009 until 2021 and would have, instead, continued with another business venture and company, which would have provided him with more income."). Plaintiffs identify no cases supporting civil RICO claims under similar factual allegations.

The Court specifically cited *D&T Partners* when requesting briefing on the RICO continuity element. Order, ECF No. 54 at 2 n.2. Plaintiffs' response addresses the facts of *D&T Partners* in a single footnote:

> There is no such lawful purpose or scheme in this case. cPaperless and the other Defendants undertook criminal and fraudulent activities in order to perpetuate a continuous and repeated unlawful endeavor – to defraud and mislead thousands (if not millions) of customers into believing they created and owned a product, which, in reality, belongs only to Acct1st, and was developed by Peel solely for the benefit of Acct1st.

ECF No. 57 at 20 n.2. Plaintiffs point to no specific allegations in support of this contention, instead citing the second amended complaint in general. *Id.* Plaintiffs' attempt to distinguish *D&T Partners* is unconvincing. Instead, this argument all but confirms that the only "scheme" is the alleged theft of "a product," and Defendants' other conduct served "to perpetuate" that alleged theft. *See id.* Plaintiffs cannot break up "a single, otherwise lawful transaction," *Word of Faith*, 90 F.3d at 123, into multiple criminal predicate acts.[22] Furthermore, as Defendants point out, "Peel has provided no explanation or legal support for how he might have standing to bring claims on behalf of supposed 'misled customers.'" ECF No. 60 at 6 n.5. Lack of

---

[22] "[C]ourts must take care to ensure that the plaintiff is not artificially fragmenting a singular act into multiple acts simply to invoke RICO." *See D&T Partners*, 2022 WL 13829913, at *7 (quoting *Schlaifer Nance & Co. v. Est. of Warhol*, 119 F.3d 91, 98 (2d Cir. 1997)). "Virtually every garden-variety fraud is accomplished through a series of wire or mail fraud acts that are 'related' by purpose and spread over a period of at least several months," but it is "unlikely that Congress intended RICO to apply in the absence of a more significant societal threat." *Id.* (quoting *U.S. Textiles, Inc. v. Anheuser-Busch Cos.*, 911 F.2d 1261, 1268 (7th Cir. 1990)).

standing aside, Plaintiffs simply never assert claims on behalf of other "misled customers" in the complaint. *See* ECF No. 48. If a company's "loan default and its resulting foreclosure" still qualifies as "an ordinary business transaction" despite any "fraudulent acts in the interim," *D&T Partners*, 98 F.4th at 208, then the transferring of assets from one jointly owned entity (Acct1st) to another (cPaperless) also must be considered "part and parcel of an otherwise lawful commercial endeavor," *id.*

Plaintiffs then proceed to argue that *D&T Partners* "is directly at odds with the United State [*sic*] Supreme Court opinion in *H.J. Inc.*" ECF No. 20 n.2. Plaintiffs insist that long-standing Fifth Circuit precedent is "partly in error." *Id.* at 3 n.1. But such arguments are more properly raised to the Fifth Circuit—the Court is bound by *Word of Life* and its progeny, including *D&T Partners*. Moreover, the Fifth Circuit's "highly fact-intensive analyses" in *D&T Partners* is consistent with the approaches used in other circuits that weigh a variety of factors when considering continuity. *See* 98 F.4th at 206-07 (collecting cases).

Indeed, the Supreme Court approved of such case-by-case, multi-factor tests for determining continuity. *See H.J. Inc.* at 241 & n.3 (citing *Barticheck*, 832 F.2d at 39). For example, many circuits consider six non-exhaustive factors: "(1) the number of unlawful acts; (2) the length of time over which the acts were committed; (3) the similarity of the acts; (4) the number of victims; (5) the number of perpetrators; and (6) the character of the unlawful activity." *Tabas v. Tabas*, 47 F.3d

1280, 1292 (3d Cir. 1995) (citing *Barticheck*, 832 F.2d at 39); *cf. Malvino*, 840 F.3d at 231-32 (citing *Tabas* approvingly). No single factor is dispositive, although occasionally, "some factors will weigh so strongly in one direction as to be dispositive." *Edmondson & Gallagher v. Alban Towers Tenants Ass'n*, 48 F.3d 1260, 1265 (D.C. Cir. 1995). Nearly every circuit agrees that where a plaintiff alleges "only a single scheme," "a single discrete injury," and "a small number of victims," it is then "virtually impossible for plaintiffs to state a RICO claim." *Id.*; *accord Grubbs v. Sheakley Group, Inc.*, 807 F.3d 785, 805 (6th Cir. 2015); *Efron v. Embassy Suites (P.R.), Inc.*, 223 F.3d 12, 19 (1st Cir. 2000); *Wade v. Hopper*, 993 F.2d 1246, 1251 (7th Cir. 1993); *SIL-FLO, Inc. v. SFHC, Inc.*, 917 F.2d 1507, 1516 (10th Cir. 1990); *D&T Partners*, 98 F.4th at 206-07 (citing *Grubbs*, *Wade*, *Efron*, *SIL-FLO* approvingly).

Plaintiffs' argument that Fifth Circuit RICO precedent is somehow out of alignment is unsupported and without merit.

### b. *Plaintiffs identify no instances where courts have found closed-ended continuity under similar circumstances.*

Even setting aside the commonsense approach to continuity applied in *Word of Faith* and *D&T Partners*, Plaintiffs have not established closed-ended continuity. "A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time." *H.J. Inc.*, 492 U.S. at 242. However, "[p]redicate acts extending over a few weeks

33

or months . . . do not satisfy this requirement." *Id.* The Fifth Circuit has consistently refused to recognize closed-ended continuity for conduct spanning less than a year. *See Malvino*, 840 F.3d at 232 (finding five months "too short"). Courts consider the duration between the first and last predicate act rather than the timeframe of events covered in the complaint. *See Tel-Phonic*, 975 F.2d at 1140 (holding two predicate acts seven months apart insufficient despite complaint's three-year timeframe).

Defendants argue that at most Plaintiffs' allegations amount to theft "through fraudulent means." ECF No. 56 at 26. However, "there is no allegation that this theft was planned, operated, or otherwise required more than a single act in order to be accomplished." *Id.* Defendants allegedly stole Acct1st's source code at some point around the company retreat in the summer of 2015, ECF No. 48 ¶ 77, and Gensch's escrow request on August 5, 2015, *id.* ¶ 97(e). Plaintiffs allege no other "acts of theft" or any other injurious "bad act," aside from innocuous conversations that are allegedly fraudulent simply because Gensch and others never informed Peel about the existence of cPaperless. ECF No. 56 at 26. Defendants thus accomplished their scheme in "a matter of days, or at most weeks, which would be insufficient to support a theory of closed continuity." *Id.* (citing *Malvino*, 840 F.3d at 232).

Plaintiffs counter that "Defendants' predicate acts took place over the course of several years between 2005 and 2021," which is "more than sufficient to meet RICO's continuity requirement." ECF No. 57 at 17-18. But at most, Plaintiffs have

only identified eight predicate acts, ECF No. 48 ¶¶ 77, 96-97, even assuming those allegations satisfied Rule 9(b) and have not been waived. The earliest predicate act occurred in March of 2009, *id.* ¶ 97(a), and the most recent on July 31, 2020, *id.* ¶ 97(g). Plaintiffs identify no authority supporting RICO continuity for allegations amounting to less than one predicate act *per year*. The authorities Plaintiff cite are inapposite. *See* ECF No. 57 at 18-19; *Richardson v. Cella*, 1 F. Supp. 3d 484, 490 (E.D. La. 2014) (finding "sixteen loan requests extended over six years" sufficient); *Wardlaw v. Whitney Nat'l Bank*, 74 F.3d 1237 (5th Cir. 1995) (remanding for district court to consider closed-ended continuity where plaintiff alleged "series of related RICO predicates extending over a substantial period of time"). *But see Wardlaw ex rel. Owen v. Whitney Nat'l Bank*, No. CIV.A. 94-2026, 1996 WL 185781, at *3 (E.D. La. Apr. 18, 1996) (finding no closed-ended continuity on remand despite "dozens of acts" spanning "just over three years" because "plaintiff alleges a single scheme" with "only one victim, and only one distinct injury"). Plaintiffs cannot establish closed-ended continuity on allegations of "sporadic activity." *H.J. Inc.*, 492 U.S. at 239.

Plaintiffs nonetheless identify one case for the proposition that "RICO is applicable to a broad range of disputes that arise out of business frauds." ECF No. 57 at 19 (citing *Cypress/Spanish Ft. I, L.P. v. Prof'l Serv. Indus., Inc.*, 814 F. Supp. 2d 698 (N.D. Tex. 2011). *Cypress* involved the breach of a construction contract and

the alleged RICO violations stemmed from a subcontractor's deficient performance
and subsequent coverup. 814 F. Supp. 2d at 704-05. Defendant PSI, the project's
geotechnical engineer, moved to dismiss the RICO claims for failure to sufficiently
"allege how long, how often, or the number of times the predicate acts occurred" for
closed-ended continuity. *Id.* at 713. The district court disagreed, noting that "a
plaintiff need not demonstrate multiple schemes," and "continuity can be established
'in various ways,' including the nature of an enterprise or 'the sheer number of
predicate acts over several years.'" *Id.* at 714 (quoting *Procter & Gamble Co. v. Big
Apple Indus. Bldgs., Inc.*, 879 F.2d 10, 16 (2d Cir. 1989)). Despite the plaintiff never
clarifying the number of predicate acts, the district court found sufficient continuity:

> In the instant case, Plaintiff alleges that [the subcontractor]'s earthwork
> was deficient "[f]rom the start," yet PSI nevertheless represented to
> Plaintiff by means of its reports, summaries, and invoices that the work
> was acceptable. Plaintiff alleges that PSI willfully emailed or faxed
> these false reports, summaries, and invoices, bribed employees to
> remain silent on the known defects on the project, and intimidated other
> employees to prevent the revelation of their misdeeds. These related
> acts formed a pattern over the course of the Project, which sufficiently
> satisfies the RICO Statute.

*Id.* Separately, in a contemporaneous decision within the same case, the district court
granted a motion to sanction PSI for spoliation of evidence. *See Cypress/Spanish
Fort I, L.P. v. Prof'l Serv. Indus., Inc.* (*Cypress II*), No. 3:10-CV-1507-B-BK, 2011
WL 13229426, at *5 (N.D. Tex. Aug. 12, 2011). The district court based its sanctions

on testimony that PSI "whited out" or physically altered portions of at least two daily field reports created pursuant to the construction contract. *Id.* at *4.

The Court does not find the cursory analysis of RICO continuity in *Cypress* convincing. *See* 814 F. Supp. 2d at 714. Despite purporting to apply Rule 9(b), the duration and amount of alleged predicate acts are not apparent from the decision. *Id.* at 711-13. It is also unclear whether the district court ultimately found continuity under a closed- or open-ended theory.[23] While the *Cypress* court obviously found a "pattern," *id.* at 714, without more context, the Court is unable to draw any broader conclusions that may be applicable to Plaintiffs' continuity arguments here. At most, *Cypress* stands for the well-established notion that "a plaintiff need not demonstrate multiple schemes" to satisfy RICO continuity. *Id.* at 714; *accord H.J. Inc.*, 492 U.S. at 240 ("[I]t is implausible to suppose that Congress thought continuity might be shown *only* by proof of multiple schemes." (emphasis in original)).

Nor are the facts of *Cypress* at all like the allegations here. Plaintiffs do not allege that Defendants "bribed or intimidated [anyone] into remaining silent." 814 F. Supp. 2d at 713. Defendants' alleged communications did not involve "concealing

---

[23] The *Cypress* court relied on *Procter & Gamble* for the proposition that "Congress did not mean 'to exclude from the reach of RICO multiple acts of racketeering simply because they achieve their objective quickly or because they further but a single scheme.'" *Cypress*, 814 F. Supp. 2d at 714 (quoting *Procter & Gamble*, 879 F.2d at 16 (quoting *United States v. Indelicato*, 865 F.2d 1370, 1383 (2d Cir. 1989)). But in context, this quote from *Indelicato* was in reference to "a scheme with no apparent termination date" or "fraud continuing indefinitely," 865 F.2d at 1383, *i.e.*, open-ended continuity.

failing test results" or "falsifying positive tests for locations that were never tested." *Id.* at 705. Nor did Defendants physically alter any evidence to perpetrate the alleged fraud. *Cypress II*, 2011 WL 13229426, at *5. Plaintiffs' view that "the fraudulent schemes at issue involving Acct1st were substantially more expansive, intricate, and sophisticated" than those in *Cypress*, and "did not involve 'normal' acts," ECF No. 57 at 19, is wholly unsupported. Plaintiffs allege no such egregious predicate acts of bribery, intimidation, or falsification of business records. *See* ECF No. 48 ¶¶ 96-97. Aside from a single theft, Defendants' alleged acts of wire fraud are utterly banal.[24] The Court finds no support for closed-ended continuity under these circumstances.

### c. *Plaintiffs do not sufficiently allege any future threat of criminal activity to satisfy open-ended continuity.*

Additionally, Plaintiffs have failed to plausibly allege facts that might support open-ended continuity. "This may be shown where there exists a 'specific threat of repetition extending indefinitely into the future,' or 'where it is shown that the predicates are a regular way of conducting [an] ongoing legitimate business.'" *Word of Faith*, 90 F.3d at 122 (quoting *H.J. Inc.*, 492 U.S. at 242-43); *see also Abraham*,

---

[24] Plaintiffs primarily rely on *Cypress* for closed-ended continuity. *See* ECF No. 57 at 17-20. While Plaintiffs cite several other cases in their analysis, Plaintiffs offer no argument as to how the facts of those cases are analogous to those alleged here. *See, e.g.*, *Bridgewater v. Double Diamond-Del., Inc.*, No. CIV.A.3:09-CV-1758-B, 2010 WL 1875617, at *9-10 (N.D. Tex. May 10, 2010) (finding both closed- and open-ended continuity from "a scheme of misrepresentation that took place 'over the course of several years' and that continues today" involving resort development association's fraudulent assessment of improper and inflated fees on property owners).

480 F.3d at 356 (finding open-ended continuity where "systematic victimization" was likely to "have continued indefinitely had the Plaintiffs not filed this lawsuit"). In contrast, where a plaintiff sues long after the defendant already "terminated any allegedly fraudulent scheme," courts are unlikely to find open-ended continuity. *Malvino*, 840 F.3d at 233 (quotation omitted); *cf. D&T Partners*, 2022 WL 1458554, at *7 (finding no future threat of repetition where "foreclosure sale marked the end point of the Defendants' alleged scheme," and mere "lawful activity—continuing to run a business—cannot form the basis of a RICO violation").

Defendants argue that no open-ended continuity exists as the "alleged theft of Acct1st's technology has long since been accomplished." ECF No. 56 at 27. Because "Acct1st is now wound down" and "has already purportedly 'withered,'" Peel "can point to nothing else even capable of being stolen from him or from Acct1st." *Id.* In response, Plaintiffs argues that "the existence of a 'single scheme' does not foreclose the application of RICO." ECF No. 57 at 22. Plaintiffs then insist that Defendants' conduct consists of "several distinct schemes with different, but related goals," *i.e.*, creating cPaperless to compete against Acct1st, stealing Acct1st's source code, and keeping Peel in the dark about everything. *Id.* at 23. But as Defendants point out, absent from Plaintiffs' response is any argument that Defendants' conduct may be repeated in the future. *See* ECF No. 60 at 7-8. The Court agrees with Defendants that

no threat of repetition has been shown on these allegations.[25]

Instead, Plaintiffs equate Defendants' arguments to those other courts previously rejected. ECF No. 57 at 21-22 (quoting *Commercial Metals Co. v. Chazanow*, No. CIV.A. 309-CV-0808-B, 2009 WL 3853704, at *7 (N.D. Tex. Nov. 17, 2009)). *Commercial Metals* involved a scheme where employees fraudulently directed business to entities owned by their spouses without disclosing those conflicts. 2009 WL 3853704, at *1-2. This resulted in 618 predicate acts of alleged wire fraud for "grossly overcharged" services over a 32-month period. *Id.* at *5. The defendants challenged continuity on the basis that the complaint did not state "when the alleged fraud actually began and ended." *Id.* at *7. The district court reasoned that the plaintiff's failure to "firmly fix the dates of the alleged conduct" was "not

---

[25] Indeed, many of the cases Plaintiffs cite in support of these arguments, ECF No. 57 at 22-23, do not support open-ended continuity under the alleged circumstances. For example, *United States v. Freeman* involved a political bribery scheme. 6 F.3d 586, 595-96 (9th Cir. 1993). The Ninth Circuit rejected arguments that no pattern could be established where "all of the predicate acts related to a single scheme." *Id.* at 595. Instead, the *Freeman* court concluded that the evidence showed "a series of improper payments over a two-year period consistent with the closed-ended concept of continuity." *Id.* at 596. A threat of future repetition was also inherent in "the nature of his crime," as political bribery and kickback schemes tend to "feed on themselves so as to become a pattern." *Id.* (quotation omitted). Plaintiffs never argue that the "nature" of Defendants' scheme is peculiarly susceptible to becoming a long-term pattern. Similarly, *Platinum Properties Investor Network, Inc. v. Sells* involved a scheme motivated by "personal animus" to destroy the plaintiff's "current and future business prospects" and "put him out of business once and for all." No. 18-61907-CV, 2023 WL 7144676, at *4 (S.D. Fla. Sept. 18, 2023). Despite the existence of only a single victim and a single scheme, the district court reasoned that open-ended continuity was satisfied where jurors "could infer that this was an indefinite goal that would extend to any of [plaintiff]'s current or future business ventures with no natural termination point." *Id.* at *5. Although the personal relationships among the former members of Acct1st's have apparently soured, *see* ECF No. 48 ¶ 2, Plaintiffs allege no similar personal animus that might result in future criminal acts directed at Peel. Other than disjointed quotes, Plaintiffs never explain how any cited case is relevant.

fatal," because "the continuity requirement . . . need not meet heightened pleading requirements." *Id.* (citing *Abraham*, 480 F.3d at 355-56). Thus, because the alleged conduct extended over a "substantial period of time," as opposed to "weeks or months," the district court found that the plaintiff adequately alleged closed-ended continuity. *Id.* Having found closed-ended continuity, the district court declined to address the plaintiff's alternative arguments for open-ended continuity. *Id.* at *7 n.5.

Plaintiffs' reliance on *Commercial Metals* in support of open-ended continuity is perplexing. Not only did the district court never reach that question, but the alleged 618 predicate acts over 32 months, *see id.* at *6-7, stands in stark contrast to the conclusory allegations here pertaining to open-ended continuity:

> As set forth above, the above series of related predicates extended over a substantial period of time, spanning years between 2005 and 2021. In addition, the above-described related predicate acts pose a threat of continued criminal activity by Defendants. The related predicate acts described above show a regular way of conducting business by Defendants. The Defendants' association-in-fact [cPaperless] exists for the purpose of committed criminal activity in the long term. And the fact that they taken [*sic*] the intellectual property of Acct1st and shuttered that company does not mean the threat of criminal activity has vanished. To be sure, there are other companies that were owned by the Defendants and Peel that will continue to suffer because of Defendants' ongoing efforts to unfairly compete in this marketplace, to misappropriate proprietary trade secrets, and to interfere with existence [*sic*] contracts and customers. The predicate acts described above show a criminal pattern that is likely to continue unless the Court intervenes to stop Defendants.

ECF No. 48 ¶ 99 (footnote omitted). Block-quoting this paragraph, Plaintiffs insist they have properly alleged open-ended continuity in the second amended complaint.

ECF No. 57 at 21-22. Yet Plaintiffs never expand on how "other companies" may be victimized in the future. The only other jointly owned entity Plaintiffs mention is SchoolDocs, ECF No. 48 ¶ 79 ("Acct1st, SchoolDocs, and Peel suffer the effects of being defrauded by Defendants"), but Plaintiffs assert no claims on its behalf. Even assuming SchoolDocs remains in business, *but see* ECF No. 36-1 at 223 (termination certificate), it is implausible that SchoolDocs will suffer from cPaperless's "directly competing products," ECF No. 48 ¶ 79, where those entities "operate in disparate markets (CPA and Higher Education)," *id.* ¶ 40. Instead, Plaintiffs' bare allegation of "a threat of continued criminal activity," *id.* ¶ 99, is merely "a formulaic recitation of the elements of a cause of action," *Twombly*, 550 U.S. at 555 (quotation omitted). The Court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678 (quotation omitted).

Absent factual allegations plausibly supporting a threat of future criminal conduct—against Peel or any other entity—the Court concludes that Plaintiffs have failed to allege RICO continuity under either a closed- or open-ended concept. Thus, because Plaintiffs fail to allege a pattern of racketeering activity—as opposed to a single instance of theft—Plaintiffs' RICO claim should be dismissed.

### B.    Plaintiffs Should Be Denied Leave to Amend.

Courts are directed to "freely give leave when justice so requires." FED. R. CIV. P. 15(a)(2). However, leave to amend is within the sound discretion of the court

and can appropriately be denied when "it is clear that the defects [of a complaint] are incurable." *Great Plains Tr. Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002). Leave to amend also may be denied for "repeated failure to cure deficiencies by amendments previously allowed." *Thomas v. Chevron U.S.A., Inc.*, 832 F.3d 586, 591 (5th Cir. 2016) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)). Nor does a court abuse its discretion by denying leave when the request is cursory and non-specific. *See id.* at 590-91 (collecting cases).

Should the RICO claim be dismissed, Plaintiffs seek leave to "replead in order to allege facts sufficient to establish diversity jurisdiction." ECF No. 57 at 29. Yet Plaintiffs cite no specific facts or arguments that might support diversity jurisdiction. Instead, Defendants jump in to supply those on Plaintiffs' behalf, arguing that "Peel is a resident of Washington state, a citizenship shared by none of the Defendants." ECF No. 56 at 31 n.15. But at the same time, Defendants note that any derivative claims on behalf of Acct1st likely cannot be reasserted in diversity. *Id.* Defendants thus ask the Court to permit Peel "to reframe some remaining claims one final time as a diversity action in order for the parties to reach a final resolution of these proceedings." *Id.* at 31. Because dismissal for lack of subject matter jurisdiction is without prejudice, Plaintiffs would simply reassert their fraud claims in state court, so "Defendants believe judicial economy will best be served by continuing in this Court." ECF No. 60 at 11.

The Court is unconvinced. Not only was diversity jurisdiction never pleaded as an alternative basis for jurisdiction despite multiple opportunities to amend, *see* ECF Nos. 1, 16, 30, 48, it does not appear to be available under these circumstances. Diversity jurisdiction under 28 U.S.C. § 1332 requires complete diversity between the parties. *McKee v. Kansas City S. Ry. Co.*, 358 F.3d 329, 333 (5th Cir. 2004). For the purposes of diversity jurisdiction, the citizenship of an LLC "is determined by the citizenship of all of its members." *MidCap Media Fin., L.L.C. v. Pathway Data, Inc.*, 929 F.3d 310, 314 (5th Cir. 2019) (quotations omitted). Due to the nature of derivative actions, federal courts have held that "in any suit in which an LLC sues, or is sued by, one of its members, the LLC will hold the same citizenship as the opposing party, thus defeating diversity jurisdiction." *Gill v. Grewal*, No. 4:14-CV-2502, 2020 WL 3171360, at *6 (S.D. Tex. June 15, 2020) (collecting cases).

Plaintiff Acct1st is an LLC registered in Texas. ECF No. 48 ¶ 6. Although the members of Acct1st are not specifically alleged in the second amended complaint, Plaintiffs clarify that Gensch, Hatfield, DeGraffenreid, and Beach are all members of Acct1st. *Id.* ¶¶ 32, 85. Consequently, the only way that Plaintiffs may replead diversity jurisdiction is by dropping all derivative claims asserted on behalf of Acct1st. *See Gill*, 2020 WL 3171360, at *6. But this would not preclude Plaintiffs from pursuing the same derivative claims in Texas state court. Should that occur, Defendants would be faced with defending two cases involving identical allegations

simultaneously, which hardly serves the purposes of judicial economy.

Furthermore, as the Court previously pointed out, Plaintiffs' claims would be barred by the statute of limitations but for application of the discovery rule and fraudulent concealment. Order, ECF No. 44 at 3. Peel's newly alleged theory of fraudulent concealment hinges on Gensch's awareness of Peel's ASD diagnosis and their prior friendship.[26] *See* ECF No. 48 ¶¶ 57, 143, 194. In contrast, Acct1st's tolling theory is premised on formal fiduciary duties owed by its members and managing officers. *See id.* ¶¶ 57, 142, 188. This dichotomy raises the inevitable specter of two courts reaching wildly divergent conclusions based on the same underlying facts.

Accordingly, leave to amend should be denied. Plaintiffs offer no indication of how they would replead their claims to satisfy diversity jurisdiction. *See Thomas*, 832 F.3d at 590-91. Indeed, Plaintiffs' request is lukewarm at best. *See* ECF No. 57 at 28-29. The Court will not keep Plaintiffs in federal court if it is no longer their preferred forum. *Cf. Sentry Ins. v. Morgan*, 101 F.4th 396, 398 (5th Cir. 2024) (noting "the party invoking federal jurisdiction" bears "the burden of proving subject

---

[26] Although the Court did not request and the parties have not provided argument on the viability of such a tolling theory, whether equitable tolling is available under such circumstances appears to be a novel question of Texas law. *Cf. CVLR Performance Horses, Inc. v. Wynne*, 792 F.3d 469, 477-78 (4th Cir. 2015) (affirming dismissal of RICO claim as time-barred where plaintiffs pleaded no link between autism and diligence for equitable tolling). This only serves to buttress the Court's conclusion that it should decline to exercise supplemental jurisdiction over Peel's claims. *See* 28 U.S.C. § 1367(c)(1) (noting supplemental jurisdiction may be declined where "the claim raises a novel or complex issue of State law").

matter jurisdiction" (quotation omitted)). Even if judicial economy was a valid basis for granting leave to amend, the Court fails to see how forcing Peel and Acct1st to proceed with the same claims in different courts would serve those interests. More importantly, Plaintiffs have repeatedly failed to cure these deficiencies despite being offered multiple opportunities to amend. *See Foman*, 371 U.S. at 182. Based on that same reasoning, the Court already informed the parties that it "will not allow further amendment at this stage." Order, ECF No. 54 at 2. The parties' arguments have not persuaded the Court to reconsider this point.

### C.   The Court Lacks Subject Matter Jurisdiction and Should Dismiss Plaintiffs' State Law Claims Absent a Viable RICO Claim.

When determining whether to retain jurisdiction after all federal claims have been dismissed, courts "look to the statutory factors set forth by 28 U.S.C. § 1367(c), and to the common law factors of judicial economy, convenience, fairness, and comity." *Enochs v. Lampasas Cnty.*, 641 F.3d 155, 159 (5th Cir. 2011). It is within the district court's discretion to "decline to exercise supplemental jurisdiction" where it "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). Applying those principles, the Fifth Circuit has reiterated that courts "should decline to exercise jurisdiction over remaining state-law claims when all federal-law claims are eliminated before trial." *Manyweather v. Woodlawn Manor, Inc.*, 40 F.4th 237, 246 (5th Cir. 2022) (quotation omitted). This is particularly true when all "federal-law claims have dropped out of the lawsuit in its early stages."

*Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988); *see also Parker & Parsley Petroleum Co. v. Dresser Indus.*, 972 F.2d 580, 590 (5th Cir. 1992) (holding that district court "abused its discretion in retaining jurisdiction over the state law claims after it had dismissed the federal RICO claims" at motion-to-dismiss stage).

Plaintiffs allege federal question jurisdiction solely through their RICO claim. ECF No. 48 ¶ 12 (citing 28 U.S.C. § 1331; 8 U.S.C. § 1961). Dismissal of Plaintiffs' RICO claim would result in only state law claims remaining. *See* ECF No. 48 ¶¶ 127-97. Foreseeing this issue, the Court specifically asked the parties to brief "whether the Court lacks subject matter jurisdiction to hear Plaintiffs' remaining state law claims if the RICO claim is dismissed." Order, ECF No. 54 at 3. The parties appear to agree that dismissal would be necessary under such circumstances. *See* ECF Nos. 56 at 29-31; 57 at 28-29. Yet no party wants the Court to dismiss this action for lack of subject matter jurisdiction. *See* ECF No. 60 at 10-11. Regardless, subject matter jurisdiction cannot be conferred by consent. *See Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982). Because this case has not proceeded past the pleading stage, jurisdiction over Plaintiffs' remaining state law claims ordinarily must be declined. *See Manyweather*, 40 F.4th at 246. Moreover, the Court remains unconvinced that further leave to amend should be granted, and because Plaintiffs state no other federal claims or basis for jurisdiction, dismissal of all remaining claims is the appropriate outcome.

## IV.   CONCLUSION

For the reasons stated above, the Court **RECOMMENDS** that Defendants' motion to dismiss, ECF No. 55, should be **GRANTED**. Plaintiffs' RICO claim should be **DISMISSED** *with prejudice*, and Plaintiffs' remaining state law claims should be **DISMISSED** *without prejudice* for lack of subject matter jurisdiction.

**The Parties have fourteen days from service of this Report and Recommendation to file written objections. 28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b). Failure to file timely objections will preclude appellate review of factual findings or legal conclusions, except for plain error. *Ortiz v. San Antonio Fire Dep't*, 806 F.3d 822, 825 (5th Cir. 2015).**

Signed on November 7, 2024, at Houston, Texas.

_____
**Dena Hanovice Palermo**
**United States Magistrate Judge**

48